No. 61,627

STATE OF KANSAS, *Appellee/Cross-appellant,* v. WILLARD GREEN, *Appellant/Cross-appellee.*

(781 P.2d 678)

Opinion filed October 27, 1989.

*Thomas Jacquinot,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant/cross-appellee.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Debra L. Barnett,* assistant district attorney, *Nola Foulston* and *Clark V. Owens,* district attorneys, and *Robert T. Stephan,* attorney general, were on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

HERD, J.: This is a criminal action wherein Willard Green appeals his jury conviction of two counts of first-degree murder, K.S.A. 21-3401; aggravated assault, K.S.A. 21-3410; and unlawful possession of a firearm, K.S.A. 21-4204. Green was sentenced to life on each count of first-degree murder, nine years for aggravated assault, and five years for the firearm conviction. The State cross-appeals on a question reserved.

The facts reveal that Willard Green and Zeola Wilson lived together for approximately one year prior to Wilson's death. Problems arose between Green and Wilson which caused Wilson to move out of Green's house and into the home of her sister, Mae Thomas, at 1343 N. Volutsia. Wilson had five children living with her and was approximately eight months pregnant.

On April 8, 1987, the day of the shootings, Green was upset because Wilson had failed to remove her property from his home. Wilson and her family contacted the police several times that day complaining that Green was harassing Wilson, following the family around, and threatening to shoot them and burn down

the house at 1343 N. Volutsia. Around 3:00 p.m., Green stationed himself in front of Mae Thomas' home and continued to walk back and forth along the street until evening.

Sometime around 8:00 p.m. on April 8, Charles Davis and Bettie Greasham, friends of Wilson, arrived at 1343 N. Volutsia to take Wilson and her children to a babysitter and away from Green. As Davis and Greasham left the car and walked to the house, each noticed Green walking around in front of the house and yelling. Davis and Greasham both entered the house.

Davis testified he saw Wilson walk outside to the Greasham car, place one child in the back seat and another in the front seat, and then get in the front passenger seat. While still in the doorway of the house, Davis saw Green run from across the street with a gun and fire two shots into the passenger side of the car. Davis testified that Green then fired two shots at the door of Thomas' house.

Bettie Greasham testified she did not see Wilson get into the car but saw her go out the front door of Thomas' house. She then heard two gunshots. Greasham testified that, while in the doorway, she saw Green point a gun at the door and shoot. Although Greasham believed she was shot it was only glass from the door that hit her, and not a bullet.

Wilson was taken by ambulance to a hospital, where she was pronounced dead at 8:52 p.m. An autopsy revealed three separate gunshot wounds: one in the right forearm; a second which entered the left side of the chest and exited the right side of the chest injuring the lungs and heart; and a third which entered the right side of the head and exited the left side. According to the pathologist's testimony either the head or chest wound would have been lethal.

After efforts to resuscitate Wilson failed, a cesarean section was performed and a male fetus of approximately 34-35 weeks was delivered. Although there were no signs of life at birth, a neonatal team immediately attempted to resuscitate the fetus. Ten minutes later a faint heartbeat was heard, but in the process of transferring the fetus to ICU the heartbeat was lost. For a while, an attempt was made to monitor the heartbeat; however, nothing was heard. After about thirty minutes in ICU, the fetus was pronounced dead. No other signs of life were detected after the birth and the pediatrician who treated the fetus described the

birth as a "still birth," even though he briefly considered the fetus alive when a heartbeat was discovered. An autopsy of the fetus revealed it was viable and did not suffer from any natural disease process; rather, it died of anoxia due to the death of the mother.

Willard Green was arrested on April 9, 1987. A .357 magnum handgun was found in the dumpster near the area where Green was arrested. The gun was owned by Green's father and was kept in his house, to which Green had regular access.

Shortly after his arrest, it became apparent that Green was injured, and he was taken to a hospital where a small caliber bullet was found lodged in his chest. To this date, Green has not revealed the origin of this wound.

On September 1, 1987, Willard Green was convicted of first-degree murder of Zeola Wilson, first-degree murder of Baby Boy Wilson, aggravated assault of Bettie Greasham, and possession of a firearm after a prior felony conviction. Notice of appeal was timely filed by both the State and Willard Green.

The first issue on appeal is whether criminal liability may be established for the killing of a viable fetus. The State appeals, upon a question reserved pursuant to K.S.A. 22-3602(b)(3), from an order and ruling of the district court judge during the prosecution of Willard Green.

The prosecution requested a jury instruction which stated that, if Baby Boy Wilson was a viable unborn fetus at the time of its death, Green could be found guilty of first-degree murder of the fetus. The court refused to give the instruction, stating it was not free to make new law and that the "viable fetus" theory was not accepted law in Kansas. The jury was permitted to consider whether Baby Boy Wilson was "born alive" to determine if Baby Boy Wilson was a "human being" as that term is used in the first-degree murder statute, K.S.A. 21-3401.

This issue is controlled by our recent decision in *State v. Trudell,* 243 Kan. 29, 36-38, 755 P.2d 511 (1988). In *Trudell,* we held that a viable fetus is not a human being within the aggravated vehicular homicide statute, K.S.A. 21-3405a. Imposing criminal liability for the killing of a fetus is a legislative function. We are prohibited from construing "viable fetus" to be within the term "human being" since such action exceeds our judicial power and denies the defendant due process of law. *Keeler v.*

*Superior Court*, 2 Cal. 3d 619, 87 Cal. Rptr. 481, 470 P.2d 617 (1970).

The *Trudell* rationale applies to this case. The State is asking this Court to impose criminal liability where the legislature has not done so. This court is well aware of the recent United States Supreme Court case of *Webster v. Reproductive Health Services*, 492 U.S. _____, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989), in which the Court reviewed, in part, the preamble to a Missouri statute. This preamble sets forth findings by the Missouri legislature that " '[t]he life of each human being begins at conception,' " and that " '[u]nborn children have protectable interests in life, health, and well-being.' " 106 L. Ed. 2d at 424. The Court held it need not rule on the constitutionality of the statute because it did not regulate abortions but constituted a permissive value judgment of a state favoring childbirth over abortion.

It could be argued that the United States Supreme Court did not overturn a statute which states that unborn children have protectable interests in life and, therefore, this court has authority to determine criminal liability for the murder of an unborn viable fetus. This argument lacks merit, however, because we are not dealing with a state statute already in effect. As we previously held, if the law is to be changed, it is up to the legislature to make that change. It has not seen fit to so do. This issue, therefore, is without merit.

The first issue raised by the appellant, Willard Green, is that it was error to allow the jury to decide the issue of the first-degree murder of Baby Boy Wilson. Green contends the jury was instructed to consider the "born alive rule" which resulted in a conviction of murder contrary to our ruling in *State v. Trudell*, 243 Kan. 29.

The record indicates the fetus was delivered by cesarean section. The pediatrician who cared for the fetus after delivery considered the birth to be a "fresh stillborn." When asked if he considered the fetus alive at some point, Dr. Yeai Roan, the pediatrician, replied, "I think the baby could have been alive a few minutes before birth, but certainly the baby was a still birth. . . . That means at the time of birth there were no signs of life." Although a temporary heartbeat was restored after resuscitation attempts, there were no other signs of life detected after the birth. In Dr. Roan's opinion, there was no brain activity from

delivery until death was pronounced; however, no tests were performed to determine brain activity.

Based upon these facts, it is Green's contention the fetus was stillborn and never became a human being as that term applies to the first-degree murder statute, K.S.A. 21-3401. Therefore, Green argues, it was error for the district court to allow the jury to decide the issue of the first-degree murder of Baby Boy Wilson.

This court has long held that in a criminal action the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Holley,* 238 Kan. 501, 510, 712 P.2d 1214 (1986); *State v. Zuniga,* 237 Kan. 788, 703 P.2d 805 (1985). This Court will not reweigh the evidence nor substitute its evaluation of the evidence for that of the jury. 238 Kan. at 511.

Although a faint heartbeat was detected and resuscitation efforts continued for forty minutes before the fetus was pronounced dead, the evidence introduced indicates the fetus was stillborn. The attending physician declared the fetus "stillborn" on the death certificate, and testified that it was brain dead from the time of the cesarean birth even though he briefly considered it alive when the heartbeat was detected. The question is: Was this sufficient evidence to support the verdict of the jury that this was a live birth and thus the fetus was a "human being," making Green guilty of first-degree murder?

K.S.A. 65-2401(2) defines "live birth":

" 'Live birth' means the complete expulsion or extraction from its mother of a product of human conception, irrespective of the duration of pregnancy, which, after such explusion or extraction, breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached."

Death is defined in K.S.A. 77-205:

"An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead."

We conclude that since the fetus was stillborn, there was not substantial competent evidence to support the jury verdict that defendant was guilty of first-degree murder in the death of the fetus. The issue here has nothing to do with when life begins; rather it has to do with when an embryo or fetus receives the

protection of the law. As we stated in *State v. Trudell,* 243 Kan. at 38, the legislature has not seen fit to make feticide a crime in Kansas. Thus, this issue should not have gone to the jury. We are therefore forced to reverse Green's conviction on Count II.

Green next contends he was denied due process because he stood trial for the death of Baby Boy Wilson along with the charge of the first-degree murder of Zeola Wilson.

A fundamental requirement of due process is the right to a fair trial in a fair tribunal. *State v. Sherry,* 233 Kan. 920, 930, 667 P.2d 367 (1983). Before a new trial is granted, the accused must meet his burden of proof and establish that any error resulted in substantial prejudice to his rights. *State v. Freeman,* 216 Kan. 653, 656-57, 533 P.2d 1236 (1975); 40 Am. Jur. 2d, Homicide § 559.

Green cites several cases where due process violations were caused by unfair trials. These cases deal with prejudicial pretrial publicity, judicial partiality, and procedural safeguards for probation violators. None of the cases deal with the issue now before the court, that is, whether an invalid charge and a valid charge may be tried simultaneously.

In the present case, evidence of the delivery of the fetus and attempts of resuscitation were presented to the jury. Additional evidence was produced which revealed that Zeola Wilson had been shot three times and that either the head or chest injury could have been fatal. Additional evidence clearly indicates that Willard Green fired the lethal shots which killed Zeola Wilson. There is not, however, any indication the evidence concerning Baby Boy Wilson was so inflammatory as to cause substantial prejudice to Green's rights. With all the evidence admitted against Green, it is apparent a jury would have found him guilty of first-degree murder of Zeola Wilson regardless of the evidence concerning the fetus. In addition, it is difficult to imagine how this case could be properly tried without mentioning the fetus. This issue is without merit.

Green next asserts that there was an abuse of discretion by the trial court in denying a motion for mistrial based upon the State's reference to a polygraph test taken by a key defense witness.

On direct examination, Clarence Burton testified he overheard a conversation between Charles Davis and some other people in which Burton heard Davis say that, after the shooting episode

between Wilson and Green, Davis ran to the car and removed a gun from Wilson's hand before the police arrived. Green relied primarily upon Burton's testimony to establish his defense that he shot Wilson in self-defense.

Upon cross-examination of Burton, the following colloquy ensued regarding the Davis conversation:

"Q: Do you remember telling Detective Millham that you are sure it was on June 15, because you had been to the Police Academy Training Center earlier that day?

"A: I wasn't at the Police Academy that day. Why I was at the Police Academy that day was because I was taking a polygraph examination. I had to make another appointment for the polygraph and I think it was a Thursday.

"Q: So what time were you at the Training Center?

"A: On the 15th, I was there in the morning at about 10:00.

"Q: So was it after you were at the Training Center that you overheard Charles make this statement?

"A: No, it was after I left the Training Center, and I talked to the officer again on the second occasion about it.

"Q: You were at the Training Center the morning of June 15; correct?

"A: Yes.

"Q: And it was after you left the Training Center, later that day, that you supposedly overheard Charles Davis make this statement; is that correct?

"A: Yes.

"Q: You went back to the Training Center two days later; correct?

"A: Yes ma'am.

"Q: That was to retake your polygraph test because you flunked it?

"A: It was to retake one portion of it."

In the absence of a stipulation between the parties, the results of a polygraph examination are not admissible in evidence. *State v. Wise,* 237 Kan. 117, 124, 697 P.2d 1295 (1985); *State v. Crossman,* 229 Kan. 384, 389, 624 P.2d 461 (1981). The State argues, however, that the issue was raised on defendant's direct examination when Burton testified he had told two police officers about the Davis conversation, opening the door for it to fully explore conversation only partially explained. *State v. Bagby,* 231 Kan. 176, 181, 642 P.2d 993 (1982); *State v. Dargatz,* 228 Kan. 322, 331, 614 P.2d 430 (1980); *State v. Morris,* 208 Kan. 464, 467, 493 P.2d 274 (1972). Cross-examination must be responsive to testimony given on direct examination and the extent of cross-examination is largely in the discretion of the trial court, which will not be reversed absent a showing of abuse of that discretion. *State v. Hobson,* 234 Kan. 133, Syl. ¶ 8, 671 P.2d 1365 (1983); *State v. Zeilinger,* 147 Kan. 707, 708, 78 P.2d 845 (1938).

The record indicates that on the morning of June 15, 1987, Burton underwent a polygraph examination as part of a job application process with the Wichita Police Department. On June 22, 1987, Burton told police officers of the Davis conversation which he had overheard, as an explanation for his failure of the polygraph examination. Upon cross-examination, Burton testified he overheard the Davis conversation during the afternoon of June 15, 1987, following the polygraph examination.

In the past we have strictly adhered to the rule that the results of a polygraph examination are not admissible evidence. The State contends it did not refer to the polygraph examination to impeach Burton's credibility based on the results of the exam. Rather, the State urges it attempted to impeach Burton's credibility by showing that Burton used facts he could not have known at the time of taking the polygraph examination to explain to police officers why he had failed the polygraph examination.

Mere mention of the word "polygraph" is not grounds for mistrial. In *State v. Blosser*, 221 Kan. 59, 62, 558 P.2d 105 (1976), we held that statements made during a polygraph examination are admissible to prove lack of credibility. Only the results of a polygraph examination are excluded because of their unreliability. Applying this rationale to the present case, it appears the State did not overstep permissible bounds in its impeachment of Burton's credibility. Thus, the trial court did not abuse its discretion in permitting the cross-examination and in denying the motion for a mistrial.

Appellant Green next asserts that the prosecutor's comments during closing argument regarding Green's post-*Miranda* silence denied him a fair trial as guaranteed by the Due Process Clause of the 14th Amendment, thereby constituting reversible error. Green's contention is based upon the following portion of the State's closing argument:

"[N]ot one person at the scene, not one witness has taken this stand and told you they saw Zeola Wilson shoot the defendant. . . . None of those witnesses saw any indication that he had been shot, not anyone that testified.

". . . *The defendant had every opportunity to tell the police, when asked, that he was injured.*

"MR. TOUSLEY: Your Honor—

"MISS FITCH: And he refused.

"MR. TOUSLEY: I am going to object to that comment on the record as to him not telling the police. That goes to his right to remain silent.

"THE COURT: You had better rephrase that, ma'am, or you are creating an inference that would not be permissible in any court in this land.

"MISS FITCH: *The defendant was asked repeatedly by the police when he was injured,* and he told them, he refused treatment at the hospital, refused examination, fought Dr. McMaster—*there is no evidence to support who shot him.*" (Emphasis added.)

Green was given a partial *Miranda* warning upon arrest and chose not to talk with the police. Comments by the prosecution, for impeachment purposes, upon a defendant's post-arrest silence after receiving *Miranda* warnings are prohibited. *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). The State contends, however, that a violation of *Doyle* does not per se require a reversal of the conviction. For support, the State relies upon *Greer v. Miller,* 483 U.S. 756, 765, 97 L. Ed. 2d 618, 107 S. Ct. 3102, *reh. denied* 483 U.S. 1056 (1987), wherein the United States Supreme Court ruled that prosecutorial misconduct must be of sufficient significance to result in the denial of a fair trial before a due process violation occurs.

Under the federal standard of harmless error, the court must be able to declare the constitutional error harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). Kansas also holds that only error failing to meet the federal standard of harmless error requires reversal. *State v. Henderson,* 226 Kan. 726, 736, 603 P.2d 613 (1979). Before a court can determine any error harmless, it must be able to declare beyond a reasonable doubt that the error had little likelihood of changing the results of a trial. *State v. Beebe,* 244 Kan. 48, 53, 766 P.2d 158 (1988); *State v. Bell,* 239 Kan. 229, Syl. ¶ 3, 718 P.2d 628 (1986). Finally, prosecutorial misconduct will be found only when the language used in final argument is manifestly intended or is of such character that the jury would naturally and necessarily understand it to be a comment on the defendant's silence. *State v. Knapp,* 234 Kan. 170, 183, 671 P.2d 520 (1983).

The State urges that the comments were not remarks on Green's silence, but were permissible statements to impeach the defendant's evidence and witnesses. We agree. The record indicates the State was attempting to show the weakness of Green's evidence to support a self-defense claim. Any error which may have occurred was cured when the court instructed the State to rephrase its statement to prevent an impermissible influence.

Green argues that the error was not cured since the court did not instruct the jury to ignore the statement. In this instance, the error was not prejudicial and given the weight of the State's evidence there is no likelihood the outcome of the trial would have been different had the State's comments not been made.

Green next argues that the jury instructions as a whole were confusing and argumentative and that particular instructions were, in fact, erroneous.

Green first contends that the instructions on self-defense were factual, argumentative, and erroneous. At trial, the defense failed to object to the "Application of Self-Defense" instruction on these grounds; therefore, our scope of review is limited to the determination of whether the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict. *State v. Maxwell,* 234 Kan. 393, Syl. ¶ 5, 672 P.2d 590 (1983).

The first challenged instruction reads as follows:

"If you find from the evidence by the proper weight of evidence that on April 8, 1987, Zeola B. Wilson was seated in an automobile and defendant ran up to the car with gun in hand and shot her causing her death and you find this was done unlawfully, willfully, intentionally, deliberately and with premeditation and that the defendant was the aggressor you should find the defendant guilty as charged.

"If you find defendant was the aggressor it is not a defense that Zeola B. Wilson may or may not have had a gun or that defendant may have thought she had a gun with which she attempted to repel an attack upon herself or another for the reason that the defense of self defense is not available to an aggressor unless the aggressor breaks off the aggression and desists.

"If you find from evidence the events occurred under circumstances in which defendant was not the aggressor but was defending himself against unlawful attack by Zeola Wilson then you will apply the 'self defense' instruction to the circumstances."

The defense maintains that the last paragraph of this instruction lacks the same vivid factual detail found in the first and second paragraphs; therefore, the instruction argues the State's case. Green relies on our recent admonition in *State v. Beebe,* 244 Kan. at 60, wherein we discouraged use of instructions which emphasize particular portions of the evidence. Green alleges the instruction given goes so far as to propose prosecutorial influences drawn from the general evidence. This argu-

ment is without merit as the instruction is not clearly erroneous. Our ruling in *Beebe* discourages this type of instruction, but does not prohibit an otherwise valid statement of the law.

The defense also argues this instruction is inconsistent with the reasonable doubt standard and conflicts with the instruction on burden of proof because the jury must find the defendant was not an aggressor before applying the self-defense instruction. This argument is also without merit. Immediately following the "Application of Self Defense" instruction is an instruction directing the jury it must find the defendant not guilty if the self-defense claim causes reasonable doubt.

Next, Green claims the instruction on "defense against an aggressor" is a misstatement of the law because it fails to state the exceptions to the rule that self-defense is unavailable to an aggressor.

The instruction given reads as follows:

"A person is justified in the use of force against an aggressor when, and to the extent, it appears to the person and the person reasonably believes such conduct is necessary to defend the person or another against the aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of the person and the existence of facts that would persuade a reasonable person to that belief.

"A person is not entitled to rely on the defense of self defense if the assailant has withdrawn from the assault.

"An aggressor who provokes an assault is not entitled to continue the aggression nor to rely on the defense of self defense if the person assaulted defends against the aggressor's assault with force reasonably calculated to repel the assault.

"A person assaulted is not required to retreat from the aggressor's assault."

PIK Crim. 2d 54.22, which was not provided to the jury, expressly states those situations where an aggressor is justified in the use of self-defense: (1) when he believes he is in life-threatening danger or has used every reasonable means to escape such danger; or (2) when he withdraws in good faith and indicates to the other he desires to withdraw and stop the use of force, but the other person continues the use of force.

Instructions must be considered together and as a whole. *State v. Martin,* 234 Kan. 115, 119, 670 P.2d 1331 (1983). The exceptions which allow an initial aggressor to rely on self-defense are present within the self-defense instructions read as a whole. The reasonable belief exception is expressed in the "Defense Against Aggression" instruction and the good faith withdrawal exception

is found in the "Application of Self Defense" instruction. We hold defendant Green has failed to show these instructions are erroneous.

The district court provided the following instruction on intent, along with PIK Crim. 2d 54.01: "The intent with which an act is committed is a mental state of the actor and, therefore, direct proof of intent is not required. Intent is generally derived from and established by the attendant facts and circumstances shown by the evidence." Green urges this instruction creates reversible error because the language creates a conclusive presumption of specific intent and shifts the burden of proof to the defendant.

A conclusive presumption is a direction to the jury to find intent once it becomes convinced of the facts triggering the presumption. *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). It is well recognized that an instruction which actually shifts or might reasonably be construed by a jury as shifting the burden of proof or persuasion to a defendant is unconstitutional and clearly erroneous. *State v. Johnson,* 233 Kan. 981, 985, 666 P.2d 706 (1983).

The above instruction is not a pattern instruction but is derived from Kansas case law, wherein we stated that specific intent is a question of fact for the jury which may be shown by acts, circumstances, and inferences and need not be established by direct proof. *State v. Dubish,* 234 Kan. 708, 717, 675 P.2d 877 (1984); *State v. Stringfield,* 4 Kan. App. 2d 559, 561, 608 P.2d 1041, *rev. denied* 228 Kan. 807 (1980). Green asserts that it is improper to apply this statement from case law as an instruction because its context involved the review of jury factfinding. We do not agree with Green's argument. The challenged instruction merely guides the jury in deciding which factors may be considered in determining criminal intent. It is not a direction to find intent if it believes other facts presented. Nor is Green required to come forward with evidence to disprove intent. No conclusive inference of intent is raised by this instruction, and no reversible error is found.

Green next argues that an instruction stating that a handgun is a deadly weapon raises a conclusive presumption. The defense failed to object on this ground at trial, limiting our review to a determination of clear error. Green's use of a gun is not disputed. The instruction is a correct statement of law and is thus not

erroneous. See *State v. Hanks,* 236 Kan. 524, 537, 694 P.2d 407 (1985).

Green also objects to the following definition: "The element of malice may be inferred from the fact of a killing by a deadly weapon." Green contends the instruction draws improper attention to many factual inferences. For support, Green again relies upon our statement in *State v. Beebe,* 244 Kan. at 60, where we discouraged the use of instructions which emphasize particular evidence such as the inference of malice from the use of a handgun.

Green's argument is without merit. In *Beebe* we discouraged this type of instruction but did not prohibit such use. Green also contends the instruction shifts the burden of proof. This argument is also without merit. The instruction directs the jury that it *may* infer malice; however, there is no presumption stated. The jury was fully instructed on the burden of proof required and that it was to assume Green was not guilty unless convinced from *all* the evidence presented beyond a reasonable doubt.

Green further challenges the instruction given concerning polygraphs:

"As you were advised during the trial, evidence concerning polygraph tests is not admissible to affect credibility for the reason that polygraph tests do not determine whether someone is or is not being truthful and was not admitted for the purpose of affecting credibility and you are not to take into account anything said about the polygraph examination as affecting credibility.

"It was admitted only because the prosecuting attorney was allowed to test the credibility of the witness to determine whether or not an explanation was given by the witness in a conversation with Detective Allen that described events which had not yet taken place."

Green alleges that the second paragraph is a factual argument which actually restates the State's theory. A general rule of law is that instructions should be general and should not be argumentative or overemphasize a particular portion of the case. *State v. Norris,* 244 Kan. 326, 338, 768 P.2d 296 (1989). In our view, the last paragraph unduly emphasizes one particular aspect of the evidence, namely that the primary defense witness was impeached for lack of credibility. The jury was made aware at trial, by repeated admonitions from the trial judge, that polygraph examination results do not bear on credibility and cannot be considered for that purpose. The first paragraph of the instruction, alone, was a sufficient statement of law; however, the error

in using the second paragraph was harmless in that in all likelihood it did not change the outcome of the trial.

Green also objects to the "unlawful acts" instruction given to the jury as being argumentative and unduly emphasizing particular facts. Green fails to state what evidence is unduly emphasized and at trial only made a general objection without stating any grounds. The instruction is valid and no error is found.

Finally, Green argues that the definitions of "live birth" and "death" are not mutually exclusive and therefore cause confusion. This objection is moot in light of our holding on Count II of the complaint.

Green's final argument is that there was an abuse of discretion by the trial court in determining that he was competent to stand trial without obtaining the aid of a professional psychological or psychiatric evaluation. This argument is based upon an episode that erupted during trial where Green threw a chair at a court guard, called the judge and the attorneys "peckerwoods," and thereafter refused to communicate with his own attorney. The defense moved for a suspension of the trial for a mental evaluation of Willard Green. The district court denied the motion based on its belief that Green lacked only faith in the proceeding, not understanding, and because Green had been alert during the trial and had consulted with his attorney. It is Green's contention that a reasonable person could not have ruled on competency without the benefit of a professional diagnosis.

K.S.A. 22-3301(1) provides that:

"[A] person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:

"(a) To understand the nature and purpose of the proceedings against him; or

"(b) to make or assist in making his defense."

K.S.A. 22-3302(2) and (3) provide in part:

"(2) If the defendant is charged with a felony, the hearing to determine the competency of the defendant shall be conducted by a district judge.

"(3) The court shall determine the issue of competency and *may* impanel a jury of six persons to assist in making the determination. The court *may* order a psychiatric or psychological examination of the defendant." (Emphasis added.)

As the above statutes indicate, the district judge is not required to seek the aid of a psychological or psychiatric evaluation of the defendant; the option is merely permissive. Whether a hearing on competency is needed during trial is a matter which is left to

the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Williams*, 228 Kan. 723, 621 P.2d 423 (1980); *City of Overland Park v. Estell*, 8 Kan. App. 2d 182, 653 P.2d 819 (1982). The record shows that the district court had reasonable grounds to believe Green was competent. Green had consulted with his attorney and appeared to understand the proceedings. It was the district court which had the opportunity to observe Green's behavior firsthand. Based upon these facts, we find no abuse of discretion.

The judgment of the trial court is affirmed on all issues except Green's conviction for murder in the first-degree for the death of the fetus, which is reversed.

SIX, J., not participating.