13 F.3d 405
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Willard GREEN, Petitioner-Appellant,
v.
Raymond ROBERTS and Attorney General of Kansas, Respondents-Appellees.
 No. 92-3347.
 United States Court of Appeals, Tenth Circuit.
 Dec. 16, 1993.
 
 Before SEYMOUR, BARRETT, and ANDERSON, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Willard Green appeals the dismissal of his petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254. He contends that he was denied his constitutional right to a fair trial (1) by the state prosecutor's reference during closing argument to Green's post-arrest silence and (2) by the prosecutor's repeated references to the results of a defense witness's polygraph examination. We grant Green's motion for a certificate of probable cause and affirm.
 
 BACKGROUND
 
 2
 We relate only the facts relevant to this appeal. Additional facts are set forth in State v. Green, 781 P.2d 678, 681-82 (Kan.1989).
 
 
 3
 On April 8, 1987, Green shot Zeola Wilson, killing her and her eighth-month fetus, as Wilson sat in a car outside her sister's home. Green and Wilson had lived together at one time but were separated when the shooting occurred. Evidence showed that Green threatened and harassed Wilson and her family for over five hours on the day of the shooting.
 
 
 4
 The following day Green was arrested and charged with first-degree murder, aggravated assault, and unlawful possession of a firearm. When arrested, he had a bullet in his chest and an entry wound not more than one day old. The source of his wound was never established.
 
 
 5
 At trial, Green's primary defense was self-defense. Without testifying himself, he tried to show circumstantially that Wilson shot him first and that he reacted defensively by shooting back. Along with the otherwise unexplained bullet in his chest, his theory of defense relied heavily on the testimony of Clarence Burton, who was a friend of the victim and was applying to join the reserve police force.
 
 
 6
 Burton did not see the shooting, but he testified that he heard two statements, one by Wilson the day of the shooting and one by Charles Davis (the first person to reach the car after the shooting) weeks later, which support an inference that Wilson shot Green at some point in the altercation that left Wilson dead. First, Burton testified that on the day of the shooting, Wilson asked him what would happen to her if she shot someone, and she indicated that a man had been bothering her. Second, Burton testified that on June 15, 1987, he overheard Davis tell a friend that when he, Davis, opened the car door, he found Wilson with a gun in her hand, and that he took the gun out of her hand and gave it to Wilson's sister.
 
 
 7
 In cross-examining Burton, the state prosecutor tried to impeach his credibility by showing that he had offered an untruthful excuse to his examiner upon learning that he failed part of a polygraph test. The substance of the polygraph test and Burton's reason for taking it had nothing to do with this case. Rather, it was part of a background check that Burton was required to complete in applying for the reserve police force. In attempting to impeach Burton, the prosecutor repeatedly stated in her questions that Burton "flunked" a polygraph. The prosecutor's statements prompted several defense objections, a motion for a mistrial which was denied, and numerous verbal and written curative instructions from the trial judge to the jury.
 
 
 8
 Later, in closing argument, the prosecutor mentioned the fact that when Green was arrested he did not tell police when or how he sustained the bullet wound to his chest. Defense counsel objected on the basis of Green's right to remain silent. The trial court instructed the prosecutor to rephrase, which she did.
 
 
 9
 Green was convicted on all charges, and his convictions were affirmed by the Kansas Supreme Court, except the murder charge for the fetus. State v. Green, 781 P.2d at 689. Green then filed this federal habeas petition, which was dismissed by the district court. Green v. Roberts, 798 F.Supp. 649, 653 (D. Kan.1992).
 
 DISCUSSION
 I.
 
 10
 Green's contention regarding the prosecutor's comment on his post-arrest silence during closing argument stems from the following exchange:
 
 
 11
 MISS FITCH: [N]ot one person at the scene, not one witness has taken this stand and told you they saw Zeola Wilson shoot the defendant.... None of those witnesses saw any indication that he had been shot, not anyone that testified.
 
 
 12
 ... The defendant had every opportunity to tell the police, when asked, that he was injured.
 
 
 13
 MR. TOUSLEY: Your Honor--
 
 
 14
 MISS FITCH: And he refused.
 
 
 15
 MR. TOUSLEY: I am going to object to that comment on the record as to him not telling the police. That goes to his right to remain silent.
 
 
 16
 THE COURT: You had better rephrase that, ma'am, or you are creating an inference that would not be permissible in any court in this land.
 
 
 17
 MISS FITCH: The defendant was asked repeatedly by the police when he was injured, and he told them, he refused treatment at the hospital, refused examination, fought Dr. McMaster--there is no evidence to support who shot him.
 
 
 18
 Trial R. Vol. VIII at 41-42.
 
 
 19
 Green contends that the comments on his silence with respect to his injury violated his right to remain silent and therefore his right to a fair trial. He has exhausted his state remedies on this claim. 28 U.S.C. 2254(b). Both the state and federal courts before us concluded that the prosecutor did not commit constitutional error, and that the error, if committed, was harmless. We review de novo the mixed questions of fact and law of whether constitutional error occurred, Nichols v. Sullivan, 867 F.2d 1250, 1253 (10th Cir.), cert. denied sub nom. 490 U.S. 1112 (1989), and if so, whether the error was harmless. Graham v. Wilson, 828 F.2d 656, 659 (10th Cir.1987), cert. denied, 484 U.S. 1069 (1988).
 
 
 20
 The Kansas Supreme Court found that "Green was given a partial Miranda warning upon arrest." State v. Green, 781 P.2d at 685. This finding is presumed to be correct on federal habeas review, 28 U.S.C. 2254(d); Tapia v. Tansy, 926 F.2d 1554, 1557 (10th Cir.), cert. denied, 112 S.Ct. 115 (1991), and respondent does not contest this finding in any event.
 
 
 21
 A state prosecutor's use for impeachment purposes of a defendant's silence after receiving Miranda warnings has been held to violate due process. Doyle v. Ohio, 426 U.S. 610, 619 (1976). The test for determining whether a comment on the defendant's silence is impermissible is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent. United States v. Mora, 845 F.2d 233, 235 (10th Cir.) (quoting United States v. Morales-Quinones, 812 F.2d 604, 613 (10th Cir.1987)), cert. denied, 488 U.S. 995 (1988). "The court must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact on the jury." Id. If some other equally plausible explanation exists for the prosecutor's comments, manifest intent will not be found. Id.
 
 
 22
 In finding no error, the courts before us examined the context of comments at issue and decided that the prosecutor intended only to comment on the lack of evidence supporting Green's theory of self-defense, rather than to comment on Green's post-arrest silence, specifically. Green v. Roberts, 798 F.Supp. at 652; State v. Green, 781 P.2d at 686. We disagree. While offered in close proximity to her summary of the relative lack of evidence of Green's claim of self-defense, the prosecutor's reference to his refusal to tell police when and how he was injured appears in our view to have been used deliberately as a distinct, additional weapon of impeachment. Whether or not the jury understood it as such, we hold that the prosecutor manifestly intended to comment on Green's post-arrest silence, thereby violating the "implicit assurance" of the Miranda warning that his silence would not be used against him. See Wainright v. Greenfield, 474 U.S. 284, 291 (1986).[2]
 
 
 23
 Nevertheless, we find that this error was harmless. Both the state supreme court and federal district court reviewing this issue found that the Doyle error, if committed, was "harmless beyond a reasonable doubt" under Chapman v. California, 386 U.S. 18, 24 (1967). Since these two decisions, the Supreme Court has held that a less stringent standard of harmless error applies on federal habeas review of trial errors, including Doyle violations. See Brecht v. Abrahamson, 113 S.Ct. 1710, 1722 (1993). The appropriate test is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 1721 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Under this test, "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.' " Id. at 1722.
 
 
 24
 The Court noted that the existing body of federal case law applying the harmless error standard of 28 U.S.C. 2111 is relevant in applying the "substantial influence" standard to habeas review of trial errors. Id. We have construed 2111 to mean that "[t]he error was harmless unless it had a substantial influence' on the outcome or leaves one in grave doubt' as to whether it had such an effect." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir.1990) (en banc).
 
 
 25
 Green contends that the prosecutor's comment about his refusal to tell police when and how he was wounded could not have been harmless because his silence pertained to facts central to his defense, as opposed to "less important" facts. He argues that because of the comment the jury necessarily viewed his silence as "deceitful silence, a silence suggesting that the bullet came from some source other than the gun of Zeola Wilson." Appellant's Reply Brief at 14.
 
 
 26
 In the context of the entire trial, we are convinced that the prosecutor's comment did not have a "substantial influence" on the jury's verdict. Factors relevant to this determination include, but are not limited to, the weight of the evidence, the frequency or intensity of the error, and the trial judge's opportunity to give curative instructions or grant a mistrial. See Brecht, 113 S.Ct. at 1722 (considering the weight of the evidence and frequency of the error); United States v. Massey, 687 F.2d 1348, 1353 (10th Cir.1982) (applying the Chapman harmless error standard).
 
 
 27
 Having reviewed the record in its entirety, we find the evidence of Green's guilty actions and state of mind to be certainly weighty, if not overwhelming. Seven witnesses for the state observed Green the day of the shooting, and they uniformly described his demeanor that day as hostile towards Wilson. Four of these seven witnesses specifically heard Green threaten to kill Wilson and her family. Trial R. Vol. I. at 20, 36, 110 & Vol. II at 46. Green showed one of these witnesses three bullets when stating that he was going to kill Wilson. Five witnesses observed at least part of the shooting through sight or sound, and although their accounts varied in how many shots were fired and Green's exact position when firing each of the shots, none of the witnesses' accounts have Wilson with a gun or have Green reacting defensively when firing into the car. Trial R. Vol I at 54, 82, 137 & Vol. II at 79, 95. Several witnesses also observed Green firing towards the house where Wilson had been living as he fled the scene, which is not an act consistent with his theory of self-defense. In contrast, Green's self-defense claim relies entirely on circumstantial, sketchy evidence comprised of the second-hand testimony of Clarence Burton and an unexplained chest wound.
 
 
 28
 Moreover, the prosecutor's error was slight in the context of the entire trial. Green did not testify, so his silence after his arrest was not used to impeach the credibility of his testimony. The only reference to his post-arrest silence was made in a single statement during a lengthy closing argument. The entire exchange at issue filled only one page of the approximately 600 pages of the trial transcript. And finally, we agree with the courts before us that the trial judge's prompt intervention upon defense counsel's specific objection had a curative effect on the prosecutor's improper comment, even though the judge's response was not specifically directed to the jury.
 
 
 29
 In sum, we have no "grave doubt" as to whether the prosecutor's improper comment had a "substantial and injurious effect or influence in determining the jury's verdict." We are convinced, as were the two courts reviewing the record before us under an even more stringent standard, that it had no such effect. We therefore hold that the error was harmless.
 
 II.
 
 30
 Green next challenges the prosecutor's repeated references to the fact that a key defense witness had "flunked" a polygraph examination.[3] Generally, the admissibility and use of polygraph evidence are matters of state law and present no issues cognizable on federal habeas review. 28 U.S.C. 2254(a); Estelle v. McGuire, 112 S.Ct. 475, 480 (1991); Jackson v. Garrison, 677 F.2d 371, 373 (4th Cir.), cert. denied, 454 U.S. 1036 (1981).[4] Green argues, however, that the prosecutor's persistence in bringing the witness's failure of an unrelated polygraph test to the jury's attention so tainted the proceedings as to make the resulting conviction a denial of due process. Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).
 
 
 31
 We first consider whether Green exhausted his state remedies on this claim.[5] The exhaustion requirement of 2254(b) requires that the petitioner "fairly present" the substance of his federal habeas claim to the state court so that they have the first opportunity to hear the claim. Nichols, 867 F.2d at 1252. In his brief on direct appeal to the Kansas Supreme Court, Green made essentially the same arguments that he makes now. Thus, despite the Kansas Supreme Court's resolution of this issue on grounds other than due process,[6] we hold that Green exhausted his state remedies on this claim.
 
 
 32
 Habeas relief for prosecutorial misconduct is available only if the conduct was so egregious in the context of the trial as a whole that it rendered the trial fundamentally unfair. Donnelly, 416 U.S. at 637; Robinson v. Maynard, 829 F.2d 1501, 1509 (10th Cir.1987) (due process not violated where there is "no reasonable probability the outcome of the trial would have been different" if the prosecutor had not engaged in the challenged conduct). The category of infractions that violate "fundamental fairness" is defined very narrowly by the Court, Dowling v. United States, 493 U.S. 342, 352 (1990), and "should be reserved for the most serious cases, which truly shock the conscience as well as the mind.' " Rivera, 900 F.2d at 1477 (quoting United States v. Penn, 647 F.2d 876, 880 (9th Cir.) (en banc), cert. denied, 449 U.S. 903 (1980)).
 
 
 33
 Thus, we must review the record in its entirety, and we must believe there is at least a reasonable probability that the verdict would have been different if the prosecutor had not engaged in the conduct at issue. The portion of the prosecutor's cross-examination of Burton at issue went as follows:
 
 
 34
 Q: You were at the Training Center the morning of June 15; correct?
 
 
 35
 A: Yes.
 
 
 36
 Q: And it was after you left the Training Center, later that day, that you supposedly overheard Charles Davis make this statement; is that correct?
 
 
 37
 A: Yes.
 
 
 38
 Q: You went back to the Training Center ... later; correct?
 
 
 39
 A: Yes ma'am.
 
 
 40
 Q: That was to retake your polygraph test because you flunked it?
 
 
 41
 A: It was to retake one portion of it.
 
 
 42
 Trial R. Vol. IV at 42. At this point, defense counsel objected. The trial judge instructed the jury that "polygraphs don't prove anything," and warned the prosecutor to "get off the polygraph." In resuming questioning, however, the prosecutor's first question of Burton was:
 
 
 43
 Q: Isn't it true, the reason you went back to the Training Center after June 15 was because Detective Allen told you had flunked your polygraph test, you needed to be tested again?
 
 
 44
 Id. at 44-45. The defense again objected, and a conference was held outside the presence of the jury. Upon returning, the trial judge again instructed the jury at length to disregard polygraph results in assessing credibility. The prosecutor resumed questioning Burton as follows:
 
 
 45
 Q: Mr. Burton, do you recall telling Detective Allen when you talked with him the second time that the reason you didn't pass your first polygraph was because you knew [Wilson] and had overheard a conversation about Charles Davis and [Wilson] having a gun?
 
 
 46
 A: No ma'am, that is not it.
 
 
 47
 Id. at 48. There was no contemporaneous objection at this point, but defense counsel later moved for a mistrial because of the repeated references to the polygraph results, which the trial judge denied.
 
 
 48
 Detective Allen testified that Burton used his knowledge of the Davis statement as an excuse for "problems" with his June 15 polygraph. Several times during Allen's testimony the trial judge interjected to remind the jury that polygraph results did not determine truthfulness. In addition, the jury received a written instruction reminding them to disregard the results of Burton's polygraph.[7]
 
 
 49
 In dismissing Green's habeas petition, the district court noted that the prosecutor was "clearly unartful" in her attempts to impeach Burton. Green v. Roberts, 798 F.Supp. at 653. We go one step further and suggest that the prosecutor's questioning was probably contrived to discredit Burton as much as possible. In light of the entire record, however, we cannot conclude that Green's trial was fundamentally unfair. Even if the state had not attacked Burton's credibility at all, we do not think there is a reasonable probability that the jury's verdict would have changed based on Burton's uncorroborated testimony consisting of what he heard other people say. In reaching this conclusion, we incorporate our discussion in Part I evaluating the weighty evidence of Green's guilt in comparison to the speculative nature of his defense. In short, just because Burton was Green's "primary" witness does not mean that the outcome of this trial hinged on his credibility.
 
 
 50
 In addition, the trial judge made every effort to protect the fairness of the proceedings by ensuring that the jury understood the limited, even tangential purpose for which the polygraph results were being revealed. We reject Green's contention that the cumulative effect of the trial judge's repeated curative instructions magnified the polygraph results and contributed to the unfairness.
 
 
 51
 In conclusion, we find no support in the record for Green's claim that he was denied a fair trial, either by the prosecutor's closing argument or the prosecutor's cross-examination of Clarence Burton.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [2]
 Respondent did not argue in its brief on this appeal that the prosecutor's comments were permissible, only that the comment was harmless. Appellee's Brief at 3-5. Respondent did take the position at oral argument, however, that no Doyle violation had occurred
 
 
 [3]
 The prosecutor wanted to bring out the following: Burton took his polygraph test, administered by a Detective Allen, from 10:00-11:00 a.m. on June 15, 1987. That afternoon, between 3:00 and 5:00 p.m., Burton claims to have overheard Davis's statement about taking a gun from Wilson after the shooting. Several days later, Detective Allen informed Burton that he failed one portion of his polygraph and needed to retake it. In response, according to Allen, Burton blamed his poor performance on the fact that he was disturbed by what he heard Davis say about the Green-Wilson incident. If Burton in fact used this excuse he could not have been telling the truth, of course, because he completed the polygraph several hours before he overheard Davis's comment
 
 
 [4]
 Under Kansas law, which governed at trial, results of a polygraph examination are inadmissible absent a stipulation by the parties. State v. Wise, 697 P.2d 1295, 1300 (Kan.1985)
 
 
 [5]
 Respondent has not asserted nonexhaustion as a defense, and the district court proceeded to the merits of this claim without discussion the exhaustion requirement. Even so, we could raise nonexhaustion sua sponte under our rationale in Hardiman v. Reynolds, 971 F.2d 500, 502-03 & n.4 (10th Cir.1992)
 
 
 [6]
 The Kansas Supreme Court held that the trial court did not abuse its discretion in handling the prosecutor's references to the polygraph results and in denying Green's motion for a mistrial. State v. Green, 781 P.2d at 685
 
 
 [7]
 The jury instruction read:
 As you were advised during trial, evidence concerning polygraph tests is not admissible to affect credibility for the reason that polygraph tests do not determine whether someone is or is not being truthful and was not admitted for the purpose of affecting credibility and you are not to take into account anything said about the polygraph examination as affecting credibility.
 It was admitted only because the prosecuting attorney was allowed to test the credibility of the witness to determine whether or not an explanation was given by the witness in a conversation with Detective Allen that described events which had not yet taken place.
 The second paragraph of this instruction was held to be erroneous by the Kansas Supreme Court because it "unduly emphasizes one particular aspect of the evidence, namely that the primary defense witness was impeached for lack of credibility." Green, 781 P.2d at 688. This error, however, was considered harmless by the court. Id.