defendant's prior conviction may be used for purposes of sentence enhancement.

Thus, although our reasoning differs somewhat from that of the district court, we agree with its conclusion that collateral estoppel did not bar the use of Bruckner's 1999 and 2001 DUI convictions as two of the three prior convictions necessary to enhance his 2012 conviction to fourth offense.

## CONCLUSION

For the reasons discussed, we affirm the judgment of the district court.

Affirmed.

Wright, J., participating on briefs.

———————————

State of Nebraska, appellee, v.
Juan E. Castaneda, appellant.
___ N.W.2d ___

Filed February 7, 2014.    No. S-11-023.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
2. **Judgments: Appeal and Error.** In making the determination as to factual questions, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses.
3. **Trial: Judges: Evidence.** Trial judges are allowed to exclude evidence if its probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury.
4. **Criminal Law: Trial: Rules of Evidence: Polygraph Tests.** An evidentiary rule categorically excluding polygraph results is not arbitrary, because state and federal governments have broad latitude to establish rules excluding evidence from criminal trials.
5. **Trial: Juries: Witnesses: Testimony.** A fundamental principle of the justice system is that the jury is the lie detector, determining the weight and credibility of witness testimony.
6. **Polygraph Tests: Prejudicial Statements.** Polygraph results are generally inadmissible as unduly prejudicial.
7. **Rules of Evidence: Hearsay.** The foundation of trustworthiness required by the business records exception to the hearsay rule is sufficient to satisfy the authentication requirement of Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008).

8. **Trial: Evidence: Appeal and Error.** An appellate court reviews a trial court's ruling on authentication for an abuse of discretion.

9. **Trial: Rules of Evidence: Appeal and Error.** Under Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103 (Reissue 2008), error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and, in case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

10. **Constitutional Law: Appeal and Error.** The Nebraska Supreme Court ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution.

11. **Constitutional Law: Statutes: Sentences.** A law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed, is an ex post facto law and will not be endorsed by the courts.

12. **Criminal Law: Statutes: Legislature: Sentences.** Where a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise.

Appeal from the District Court for Douglas County: JOHN D. HARTIGAN, JR., Judge. Convictions affirmed, all sentences vacated, and cause remanded for resentencing.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, James D. Smith, and Stacy M. Foust for appellee.

Marsha Levick, Deputy Director and Chief Counsel, and Emily Keller and Lauren Fine for amicus curiae Juvenile Law Center.

Amy A. Miller, for amicus curiae American Civil Liberties Union Foundation of Nebraska.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

Juan E. Castaneda was convicted of several charges arising from three shootings that occurred in Omaha, Nebraska, on

November 12, 2008. We affirm Castaneda's convictions in all respects, but conclude that the sentences of life imprisonment without the possibility of parole imposed upon Castaneda were unconstitutional. Accordingly, we vacate those sentences and remand the cause for resentencing.

## II. BACKGROUND

Castaneda was convicted by a jury of two counts of first degree felony murder, one count of attempted second degree murder, one count of attempted robbery, three counts of use of a deadly weapon to commit a felony, and one count of criminal conspiracy. He was sentenced to two terms of life imprisonment without the possibility of parole for first degree murder, 10 to 20 years in prison for attempted second degree murder, 10 to 15 years in prison for attempted robbery, 10 to 15 years in prison for criminal conspiracy, and 10 to 15 years in prison for each of the weapons convictions. At the time of the shootings, Castaneda was 15 years old.

### 1. Shootings

The victim of the first shooting was found at approximately 10:45 p.m. on November 12, 2008. Luis Silva, who lived on Dorcas Street in Omaha, was found outside his home by his cousin, Jose Hernandez. Hernandez testified that when he heard a car horn and other sounds, he went outside and saw Silva on the ground with two individuals standing over him. One of the individuals near Silva was holding a gun. He pointed the gun at Hernandez and, in Spanish, demanded money. Hernandez returned to the house, and the second individual said "let's go," in English.

Silva had been shot twice. One bullet grazed the left side of Silva's head, and the second entered his chest under his left arm. Silva was declared dead upon his arrival at an Omaha hospital.

Hernandez described the two assailants. One was wearing black pants and a gray, hooded sweatshirt, and the other wore black pants and a black, hooded sweatshirt with the hood pulled over his head. Hernandez identified both as appearing to be "Latin," but when counsel for the State asked Hernandez

about their ability to speak Spanish, he answered, "Not very well. Like they were born here."

Shortly before Silva was shot, two brothers, Mark and Charles McCormick, were visiting their cousin at his residence near 13th and Dorcas Streets. As the McCormicks were leaving the residence at about 10:30 p.m., two men, one holding a gun, approached and demanded money. Mark replied that he had no money, and when he and Charles threatened the two men with a "piece of wood" or "tree stump," the men started "backing away." Mark described the first man, who was holding the gun, as wearing a gray, hooded sweatshirt. The second man was wearing a dark-colored, hooded sweatshirt.

At approximately 11 p.m., Charles Denton and Hilary Nelsen drove to a walkup automatic teller machine (ATM) in the 50th Street and Underwood Avenue area, where Denton parked the vehicle and got out to use the ATM. Denton observed two men walking through the parking lot, and he thought they looked out of place. After Denton returned to the vehicle and started to drive away, the two men ran toward Denton's vehicle. One of the men approached the driver's-side window and demanded money. The man fired a gun at the vehicle, and the driver's-side window shattered. Denton drove away and called the 911 emergency dispatch service. When he was about 1 mile away, Denton stopped the vehicle because he realized he had been shot. Denton sustained a bullet wound through his bicep and a graze on his chest.

Nelsen testified that the men were wearing baggy jeans and hooded sweatshirts. Nelsen also testified that one of the sweat-shirts was dark and one was white and that both men had the hoods pulled over their heads. Denton also said one sweatshirt was lighter and the other was darker. Nelsen said the men were young and were either "Mexican" or "African-American," but not white. Denton stated that although he did not get a good look at the men's faces, both were "Hispanic."

Shortly after 11 p.m., a passerby saw a car with its engine running and lights on in front of a gas station at 52d and Leavenworth Streets. The witness stopped because there were no lights on in the parking lot. The car door was open, and its interior lights were on. The witness saw a person lying on the

ground nearby and called 911. The victim was identified as Tari Glinsmann, who worked at the gas station and had just finished her shift. The car was a green Ford Taurus Glinsmann had borrowed from a friend that night. Glinsmann was dead when rescue workers arrived on the scene.

## 2. Cervantes' Version of Events

The State entered into an agreement with Edgar Cervantes to dismiss murder charges against him in exchange for his testimony. Cervantes testified that on November 12, 2008, he was living with Santiago Jacobo and his family. Cervantes agreed to transport Jacobo's children to and from school in exchange for the use of Jacobo's Chevrolet Cavalier.

According to Cervantes, he needed money so he called Eric Ramirez on November 12, 2008, and asked if Ramirez wanted "to go rob some people." Later that day, Cervantes met Ramirez at the home of a female friend who lived near 24th and L Streets. Cervantes stated that he had a beer and used cocaine while at the friend's house. Other people at the house included Jacob Shantz and Castaneda. Ramirez ultimately requested that Cervantes give Shantz a ride home, and Cervantes agreed. Castaneda accompanied them.

Cervantes testified that he and Ramirez were wearing black pants and gray, hooded sweatshirts and that Castaneda was wearing black pants and a black coat with fur trim. Ramirez was in the front passenger seat, and Castaneda and Shantz were sitting in the back seat.

Cervantes stated that as he was driving to Shantz' home, Ramirez asked to see the gun that Cervantes had recently purchased. The gun was under the driver's seat, wrapped in a blue bandanna. Cervantes said he handed the gun to Ramirez, and Ramirez placed the gun under his seat. After they dropped off Shantz, Cervantes, Ramirez, and Castaneda drove to 13th and Dorcas Streets where they saw two men getting out of a truck. Cervantes stated that Ramirez and Castaneda got out of the car and that he heard a gunshot shortly thereafter. Cervantes said Ramirez and Castaneda ran back to the car and stated that they had attempted to rob two white men, but that the men did not have any money and had "started getting crazy."

Cervantes testified that he then drove to 16th and Dorcas Streets, where he pointed out Silva as "the Mexican guy in the Blazer." Once again, Cervantes waited in the car while Ramirez and Castaneda got out. Cervantes said he heard two gunshots about a minute later. Cervantes stated that Ramirez later said that when Silva began blowing the car horn, Castaneda dragged Silva out of his vehicle and Ramirez shot him.

Cervantes testified that after the robbery and shooting of Silva, Cervantes drove to an area near 50th Street and Underwood Avenue, where they saw a man at an ATM. Cervantes said he waited on the other side of the street as Ramirez and Castaneda got out of the car. Cervantes said he heard two gunshots and then Ramirez and Castaneda came back to the car. Cervantes then drove south until they reached 52d and Leavenworth Streets.

Cervantes stated that Ramirez asked Cervantes to stop when Ramirez saw Glinsmann at the gas station. Ramirez and Castaneda got out of the car, and Cervantes parked in a nearby lot. Cervantes said he heard a gunshot and then Ramirez and Castaneda came back to the car and got in.

Cervantes stated that he drove back to the female friend's house near 24th and L Streets. On the way, Ramirez told Cervantes that Glinsmann had no money, that Castaneda pulled her out of the car, and that Ramirez shot her. Cervantes said he told Ramirez to keep the gun. After drinking beer and smoking marijuana for a short time, Cervantes returned to Jacobo's house. Cervantes testified that he stayed up most of the night smoking marijuana and finally went to bed in the early morning hours.

When Jacobo woke Cervantes the next morning, Cervantes said Jacobo appeared nervous. Jacobo asked Cervantes about the night before, because Jacobo noticed a number of police officers in the area. Cervantes said he told Jacobo about the robberies and told Jacobo that Ramirez "kind of went crazy with the gun." Jacobo told Cervantes to leave the home. Cervantes then went to his parents' house and stayed there.

Cervantes got a ride from Roberto Hidalgo to his parents' home after Jacobo asked him to leave. Hidalgo testified

that Cervantes said that "he [Cervantes] shot the guy and [Ramirez] did the rest." When police contacted Hidalgo shortly after the shootings, Hidalgo denied any knowledge of the crimes. Hidalgo later gave a statement to police and stated that Cervantes never mentioned Castaneda's involvement.

Five days after the shootings, the police contacted Cervantes and Cervantes denied all involvement. During a second interview on November 22, 2008, Cervantes admitted that he had been the driver of the car involved in the shootings and that Ramirez and Castaneda were also involved. Cervantes testified that he was tired of lying and that he was not initially completely truthful.

During cross-examination, Cervantes admitted that he lied to police on multiple occasions and that, in fact, he could not remember his lies. The trial court sustained the State's motion in limine to exclude all testimony regarding two polygraph examinations taken by Cervantes. Cervantes insisted that he was the driver of the vehicle, that Castaneda pulled Silva and Glinsmann out of their respective vehicles, and that Ramirez shot Silva, Denton, and Glinsmann.

### 3. Search Warrants

Castaneda's palmprint was found on the hood of Glinsmann's vehicle, the Ford Taurus she had borrowed, and a search warrant was issued for his residence. Items removed from Castaneda's bedroom included a dark-colored, hooded jacket, a disposable camera, a pair of shoes, an identification card, bandannas, and a blue spiral notebook.

During the initial search, an Omaha police officer observed a black jacket with a fur-lined hood. The jacket was not seized because it did not match any descriptions given by witnesses. However, the officer later viewed surveillance footage from the gas station where Glinsmann was shot and saw that one assailant was wearing a dark-colored, hooded jacket with fur trim.

An amended search warrant was executed on November 17, 2008, to look for the hooded jacket. Although the jacket was not found, a photograph taken with a disposable camera shows the fur-lined jacket in the background in Castaneda's bedroom.

An officer with the Omaha Police Department's gang unit also took a photograph of Castaneda in which he was wearing a black jacket with fur trim.

### 4. FORENSIC EVIDENCE

A crime scene technician with a specialty in firearms and ammunition testified that to a reasonable degree of scientific certainty, all of the recovered bullets from all of the crime scenes were fired from the same weapon.

The Chevrolet Cavalier used in the commission of the crimes was searched. Among the items found were a gray, hooded sweatshirt and a brown leather wallet containing Silva's identification. Castaneda could not be excluded as a donor for the DNA swab of the outside of the right sleeve or the outside of the left sleeve of the sweatshirt. Castaneda also could not be excluded as the donor for the swabs taken of the side of the right seat and the back seat levers of the car, nor could Castaneda be excluded as a donor for DNA swabbed from a sports drink bottle found in the back seat of the Cavalier.

### 5. ALIBI EVIDENCE

Castaneda offered alibi evidence from John Orduna and Castaneda's stepmother, who both testified that Castaneda was at home the night of November 12, 2008. Orduna, who lived in the same apartment building as Castaneda and his family, testified that he saw Castaneda that night between 9:30 and 10 p.m., but certainly before 11 p.m. Orduna stated that he and his wife often sat on the porch of the apartment building drinking beer until 1:30 or 2 a.m. and that on November 12, Castaneda came out and spoke with them. Orduna said that Castaneda was alone, that Castaneda went back inside of the apartment building, and that Orduna and his wife were on the porch until late that night. On rebuttal, however, the State called the manager from the restaurant where Orduna's wife had been employed. Employment records indicated that Orduna's wife had not clocked out until nearly 1 a.m. on November 13.

Castaneda's stepmother testified that on November 12, 2008, Castaneda went to school and arrived home around 3:30 p.m.

Castaneda left the apartment with his father at approximately 6 p.m. to pick up Castaneda's girlfriend, and they took the girlfriend back home around 8:30 p.m. Castaneda and his father were home by 9 p.m., and Castaneda did not leave the apartment again that evening. Castaneda's stepmother testified that she was awake until 11 p.m. On cross-examination, however, she said that she was a sound sleeper and that she would not have awakened if Castaneda had left the apartment. She also stated that she did not recall seeing Orduna on the porch that day.

The jury found Castaneda guilty on all counts, and he appeals.

## III. ASSIGNMENTS OF ERROR

Castaneda assigns that the trial court erred when it (1) allowed the jury to review an exhibit during its deliberations, (2) precluded him from offering evidence that Cervantes had failed a polygraph examination, (3) allowed cell phone records into evidence, (4) allowed the State to present fingerprint evidence, and (5) sustained the State's hearsay objection to an Internet news report. Castaneda also assigns that the accumulation of errors constitutes reversible error, even if any one error does not. In addition, he argues that the trial court erred when it unconstitutionally sentenced Castaneda to life in prison without the possibility of parole.

The State argues that the trial court committed plain error when it did not make the sentences for use of a deadly weapon consecutive to all convictions.

## IV. STANDARD OF REVIEW

[1] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1]

[2] In making the determination as to factual questions, an appellate court does not reweigh the evidence or resolve

---

[1] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses.[2]

## V. ANALYSIS

Castaneda's assignments of error generally fall into two categories: whether the trial court erred when it admitted or excluded certain evidence and whether it is unconstitutional to sentence a juvenile to life without the possibility of parole. We address the evidentiary issues first.

### 1. Evidentiary Issues

#### (a) Exhibit 201—Crime Scene Video

William Henningsen, a criminalist and expert in digital images and forensic video with the Omaha Police Department, removed the entire surveillance system from the gas station where Glinsmann was shot. The cameras were motion sensitive, and Henningsen was able to make a frame-by-frame copy of the video and to clarify and enlarge the images. Exhibit 201 was one of those enhanced copies, and it included yellow notes and arrows pointing to Glinsmann and "Subject #1" and "Subject #2."

During deliberations, the jury requested that it be allowed to review the complete video presentation created by Henningsen. The defense objected, asserting that it gave improper emphasis on Henningsen's testimony. The jury indicated that it wanted to review the gas station video in slow motion or frame-by-frame. The only exhibit that allowed for such a review was exhibit 201. With counsel present in the courtroom, the court allowed limited review of portions of exhibit 201, as requested by the jury. The jury was not allowed to take the exhibit to the jury room.

Castaneda claims it was error to allow the jury to review the exhibit because it was testimonial evidence that

---

[2] *State v. Vela*, 279 Neb. 94, 777 N.W.2d 266 (2010).

improperly emphasized Henningsen's testimony and not that of the other witnesses.

Conversely, the State argues that the video was substantive evidence of the Glinsmann murder and that Henningsen's notes did no more than indicate portions of the video that the members of the jury could view for themselves.

This court has previously noted that, generally, a trial court does not have discretion to submit testimony materials to the jury for unsupervised review, but that the trial court has broad discretion to submit to the jury nontestimonial exhibits, in particular, those constituting substantive evidence of the defendant's guilt.[3] And in this instance, the video to which Castaneda objects is substantive evidence of the crimes for which Castaneda was charged. The images from that video were proof that Castaneda was, in fact, one of the perpetrators of the charged murders.

Henningsen's testimony at trial provided an explanation of the techniques used to retrieve the video surveillance from the gas station and the steps he followed to organize the video for presentation for trial. But his notes to exhibit 201 were not part of that testimony; rather, the notes were merely intended to facilitate the jury's viewing of the exhibit.

And in any case, the trial court followed the procedure adopted by this court for use in determining when a jury should be permitted to view evidence after the parties rest. We have noted:

> When a jury makes a request to rehear certain evidence, the common-law rule requires that a trial court discover the exact nature of the jury's difficulty, isolate the precise testimony which can solve it, and weigh the probative value of the testimony against the danger of undue emphasis. If, after this careful exercise of discretion, the court decides to allow some repetition of the tape-recorded evidence for the jury, it can do so in open court

---

[3] *State v. Pischel*, 277 Neb. 412, 762 N.W.2d 595 (2009).

in the presence of the parties or their counsel or under other strictly controlled procedures of which the parties have been notified.[4]

During deliberations, the jury asked to be allowed to watch the surveillance video in slow motion or frame-by-frame. After inquiring as to the specific testimony that would resolve the jury's question, the trial court determined that exhibit 201 was the only exhibit that would meet the jury's request. With counsel present in the courtroom, the court allowed the jury to review the exhibit. The trial court did not abuse its discretion in allowing the jury to review the video in the courtroom in the presence of counsel.

### (b) Polygraph Examinations

Cervantes was given two polygraph examinations. The first was administered on April 16, 2010, after a jailhouse informant told police Cervantes had admitted that he shot Silva and that Ramirez shot Glinsmann. Cervantes was asked whether he had fired the shots that resulted in the deaths of Silva and Glinsmann. The officer administering the test determined that Cervantes was being deceptive in his answers to the questions about Silva. The test was inconclusive as to the questions about Glinsmann.

Cervantes was told by police that he failed the test. He was interviewed by police a second time, during which Cervantes explained that he believed he failed the first polygraph examination based on his guilt at having pointed out Silva to Ramirez and Castaneda. Cervantes was then asked to provide a written statement about the events of November 12, 2008, after which he was given a second polygraph examination. It consisted only of questions about whether the written statement was true. Cervantes was told he passed the second test.

The State made a motion in limine, seeking to bar the defense from mentioning the polygraph examinations or their results. The trial court sustained the motion, and in an offer of

---

[4] *State v. Dixon*, 259 Neb. 976, 987, 614 N.W.2d 288, 297 (2000), *disapproved on other grounds, State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012).

proof, the defense showed generally that in the first polygraph examination given on April 16, 2010, Cervantes had been deceptive regarding his role in Silva's death and had denied telling the jailhouse informant he shot Silva.

Castaneda argues that he should have been allowed to cross-examine Cervantes regarding his failure of the first polygraph examination and that the failure to allow this questioning prevented him from presenting a complete defense as provided in *Holmes v. South Carolina*.[5]

In *Holmes*, the defendant sought to introduce evidence of a third party's guilt in order to raise doubt about his own guilt.[6] South Carolina rules of evidence prohibited admission of evidence relating to a third party's guilt if it "'"cast[s] a bare suspicion upon another"'" or "'"raise[s] a conjectural inference as to the commission of the crime by another."'"[7] The South Carolina Supreme Court held that because there was strong forensic evidence against the defendant, he could not introduce evidence of a third party's guilt simply to raise the inference of his own innocence.[8]

[3] The U.S. Supreme Court stated that while state courts have broad latitude to establish rules excluding evidence from criminal trials, that latitude has limits. "'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'"[9] But the Supreme Court also noted that

> well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion

---

[5] *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).

[6] *Id.*

[7] *Id.*, 547 U.S. at 324, quoting *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941).

[8] *Id.*

[9] *Id.*, 547 U.S. at 324, quoting *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

of the issues, or potential to mislead the jury. . . . Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[10]

Castaneda relies on cases from other jurisdictions to suggest that the evidence of polygraph examinations should have been admitted. However, we do not find the cases supportive of Castaneda's position. In *State v. McDonough*,[11] after the State's main witness to a robbery was told that he had failed a polygraph examination, he changed his testimony and identified the defendant as the robber. At trial, the witness admitted that he first attempted to change his testimony out of fear of retaliation by the defendant or his family. The defendant sought to impeach the witness with the polygraph evidence, seeking to demonstrate that the test was instrumental in procuring the witness' identification of the defendant at trial.[12] Under those circumstances, the court concluded, the polygraph examination was more probative than prejudicial. The court held that the admission of polygraph results was not unduly prejudicial to the defendant, but it cautioned that polygraph results are generally not admissible.

In *State v. Green*,[13] on cross-examination, the State referred to a polygraph examination taken by a witness who allegedly overheard a conversation that would have supported the defendant's claim of self-defense. On appeal, the State asserted that it referred to the polygraph to show that the witness "used facts he could not have known at the time of taking the polygraph examination to explain to police officers why he had failed the polygraph examination."[14] The appellate court held that statements made during a polygraph examination

---

[10] *Id.*, 547 U.S. at 326-27, quoting *Crane, supra* note 9.

[11] *State v. McDonough*, 350 A.2d 556 (Me. 1976).

[12] *Id.*

[13] *State v. Green*, 245 Kan. 398, 781 P.2d 678 (1989).

[14] *Id.* at 406, 781 P.2d at 685.

are admissible to demonstrate a lack of credibility but that the results of a polygraph examination are excluded because of their unreliability.[15]

Factually similar to the case at bar, in *U.S. v. Pitner*,[16] an informant was given a polygraph examination and gave answers that indicated deception. After the informant was confronted with the results of the examination, he changed his story. The federal district court ultimately admitted the evidence that the witness changed his story, but excluded the results of the examination itself.

[4,5] In the case at bar, Castaneda is seeking to admit the *results* of the polygraph examinations. In *United States v. Scheffer*,[17] the U.S. Supreme Court has held that an evidentiary rule categorically excluding polygraph results is not arbitrary, because state and federal governments have broad latitude to establish rules excluding evidence from criminal trials. There is no consensus that polygraph evidence is reliable, and a fundamental principle of the justice system is that the jury is the lie detector, determining the weight and credibility of witness testimony.[18] The *Holmes* Court cited *Scheffer* with approval as a case involving an evidentiary rule that was *not* arbitrary or unreasonable.[19]

[6] In Nebraska, we have held that polygraph results are generally inadmissible as unduly prejudicial.[20] However, in *State v. Riley*,[21] where the mere mention that a witness had taken a polygraph examination and presumably passed it bolstered the witness' credibility, we concluded that the trial court abused its discretion when it overruled the defendant's motion for a mistrial based on the polygraph reference. Implicit in our

---

[15] *Id*.

[16] *U.S. v. Pitner*, 969 F. Supp. 1246 (W.D. Wash. 1997).

[17] *United States v. Scheffer*, 523 U.S. 303, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998).

[18] *Id*.

[19] *Holmes*, *supra* note 5.

[20] See *State v. Riley*, 281 Neb. 394, 796 N.W.2d 371 (2011).

[21] *Id*.

holding was the proposition that it was the jury's responsibility to determine the credibility of witnesses.

Castaneda claims that he wanted to be able to confront Cervantes with the fact that he had changed his version of events after he was told he failed the first polygraph examination. But ultimately, Castaneda is seeking to admit the results of the polygraph to cast doubt on Cervantes' credibility as a witness—something that the jury, as fact finder, is charged with determining. Similar to *Riley*, in which the mention of a polygraph examination bolstered a witness' testimony, the mention of Cervantes' failed polygraph examination in this case would cast doubt on his credibility.

Furthermore, Castaneda had the opportunity to rigorously cross-examine Cervantes regarding the conflicting statements he made to police. Castaneda also cross-examined the police officer who reinterviewed Cervantes and asked the officer's opinion as to whether Cervantes lied about his role in the shootings. The following exchange occurred during the recross-examination of the officer:

> [Defense counsel:] And when you say you wanted to see if [Cervantes] was telling the truth, you mean you would challenge him with statements of other people?
>
> [Officer:] Correct.
>
> Q. And you told him flat out he was lying to you, didn't you?
>
> A. Yes, I did.
>
> Q. And you had reason to believe that he was lying to you, didn't you?
>
> A. With the change of information, yes.
>
> Q. Is that the only reason? Just yes or no.
>
> A. Is that the only reason?
>
> Q. That you had reason to believe he wasn't telling the truth?
>
> A. No.

The officer ultimately testified that Cervantes changed some details but that overall, Cervantes' version of the events of November 12, 2008, did not change. The jury also heard testimony from the person who gave Cervantes a ride the day after

the shooting and from the jailhouse informant who claimed that Cervantes had admitted to killing Silva. While the particulars of Cervantes' story changed, he never wavered in his statements to police that he was the driver of the vehicle on the night of the shootings, that Castaneda was involved, and that Ramirez shot Silva and Glinsmann.

Castaneda was able to thoroughly cross-examine Cervantes regarding the conflicting statements he made to police and was able to systematically develop his defense by showing that Cervantes lied to police and that Cervantes changed his story when he was confronted with his lies. Without being told of the polygraph examinations or their results, the jury was made aware that police had reason to believe that Cervantes was lying. It was not necessary to actually ask Cervantes if he failed the first polygraph examination.

As the U.S. Supreme Court noted, the jury acts as a lie detector, and as the finder of fact, the jury was responsible for determining whether Cervantes was a credible witness.[22] The trial court did not err in sustaining the State's motion in limine excluding the results of the polygraph examinations. Castaneda's second assignment of error is without merit.

### (c) Cell Phone Records

Castaneda next assigns that the trial court erred by admitting the records of cell phone calls and text messages.

The operations coordinator for a cell phone company in Nebraska testified as a custodian of records for that company. Records of cell phone calls and texts are each stored in different servers for 6 months. Data are recorded at the time a call is made or a text is sent. A subpoena was issued for the cell phone numbers registered to Castaneda's stepmother and to Ramirez. The records showed no calls on Castaneda's cell phone between 9:50 p.m. and 11:44 p.m. on November 12, 2008. Cell phone activity resumed at 11:44 p.m. and continued until 12:25 a.m.

---

[22] See *Scheffer, supra* note 17.

Castaneda argues that computer-generated records which are manually entered are not assertions of a declarant and should be scrutinized for admissibility under rule 901,[23] which provides the requirements for authentication or identification of evidence.

[7] We recently addressed a similar argument in *State v. Taylor*.[24] We stated that "[i]f the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1)."[25] "The foundation of trustworthiness required by the business records exception is sufficient to satisfy the authentication requirement of rule 901."[26] In *Taylor*, the cell phone records at issue were authenticated by the same employee who testified in the case at bar. The employee's testimony in *Taylor* was sufficient to authenticate the cell phone records, and it is also sufficient in this case.

Our opinion in *Taylor* was released after Castaneda submitted his briefs. Castaneda conceded at oral argument that *Taylor* resolved the issue. This assignment of error is therefore without merit.

### (d) Fingerprint Evidence

At trial, the court received into evidence the surveillance footage from the gas station where Glinsmann was shot and a latent palmprint lifted from the hood of Glinsmann's vehicle, the Ford Taurus she had borrowed. Glinsmann's vehicle was towed to the police garage at the impound lot for processing. Because the vehicle was dirty, areas where dirt had been disturbed were visible and crime scene technicians were able to check for latent prints on those areas. Video surveillance from the gas station also showed the assailants pass near the hood of the vehicle.

A crime scene technician with a specialty in fingerprint identification testified that she dusted the exterior of

---

[23] Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008).

[24] *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011).

[25] *Id*. at 315, 803 N.W.2d at 760.

[26] *Id*. at 315, 803 N.W.2d at 761.

Glinsmann's vehicle for fingerprints, concentrating on areas where it appeared that the dust and dirt on the vehicle had been smudged. The fingerprint specialist lifted three latent prints from the vehicle: one from above the driver's-side door handle, which print belonged to Glinsmann, and two on the hood of the vehicle on the passenger side, which prints appeared to be two parts of a left palmprint. That palmprint was later identified as belonging to Castaneda.

Castaneda argues that the trial court committed reversible error when it allowed the State to present testimony regarding fingerprint identification through the use of the "Automated Fingerprint Identification System" (AFIS), a database of prints on file from Nebraska. Castaneda claims that because the fingerprint specialist did not know when Castaneda's prints were scanned into AFIS, any testimony regarding AFIS was hearsay. Castaneda suggests that testimony should have been elicited to show the process used to enter his fingerprints into AFIS. Without such testimony, Castaneda claims there was insufficient foundation.

[8] An appellate court reviews a trial court's ruling on authentication for an abuse of discretion.[27] We note that although Castaneda attacked the scientific validity and reliability of fingerprint identification at trial, he does not raise that issue on appeal.

In support of his argument, Castaneda cites a North Carolina case in which an officer compared the latent fingerprint to a "master file," and then compared fingerprints taken by the officer to latent prints found at the scene of the crime.[28] The North Carolina court determined that testimony regarding the master file fingerprint violated the hearsay rule and should have been excluded. If the conviction rested on the fingerprint evidence, it could not stand. However, the court found that the "evidence as to the common origin of [the] defendant's known fingerprint and the latent print . . . is so overwhelming, and the prejudicial effect of the incompetent testimony concerning the master file fingerprint is so

---

[27] See *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

[28] See *State v. Foster*, 284 N.C. 259, 263, 200 S.E.2d 782, 786 (1973).

insignificant by comparison, that the incompetent evidence was harmless beyond a reasonable doubt."[29] Exclusion of the evidence concerning the master file fingerprint would not have produced a different result.[30]

We find *Foster* persuasive but unhelpful to Castaneda's arguments. The technician in *Foster* used virtually the same procedure used by the technicians in the case at bar. After using a "master file" or AFIS to make a preliminary identification, a new set of inked prints was taken from the subject. Those prints were then compared to the latent prints found at the crime scene. Therefore, even if testimony regarding the "master file" prints, or the prints found in AFIS, could be considered inadmissible hearsay, the error was harmless, because the actual identification was made from the inked prints that the technician personally obtained from Castaneda.

In addition, Castaneda was able to cross-examine the fingerprint specialist thoroughly on her credentials and training, as well as on the fact that she did not know any details concerning the date Castaneda's prints were scanned into AFIS or the identity of the person who completed the scan. As pointed out by the State, whether the known prints in AFIS belonged to Castaneda went to the weight of the evidence, which is determined by a jury.[31] The trial court did not abuse its discretion by allowing the testimony. This assignment of error is also without merit.

(e) Internet News Report

Castaneda offered into evidence a printout of an Internet news story that indicated Castaneda's palmprint had been found on the hood of the Glinsmann vehicle at 52d and Leavenworth Streets. The trial court refused to allow it, finding that it was inadmissible hearsay.

Castaneda argues that the story was not offered for the truth of the matter asserted, but, rather, was offered to demonstrate that it was public knowledge that Castaneda had been arrested,

---

[29] *Id*. at 274, 200 S.E.2d at 793.

[30] *Id*.

[31] See *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011).

that his palmprint was found at the scene, and that Cervantes named Castaneda, who had been arrested, to turn suspicion away from himself.

[9] Under evidence rule 103[32]:

> (1) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:
>
> . . . .
>
> (b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

When Castaneda sought to introduce the news story during trial, he did not argue that the story would demonstrate that fingerprint evidence linking Castaneda to the crime was public knowledge. Castaneda argued only that the story was not being offered for the truth of the matter. He failed to establish the news story's relevance, and we find no error in the trial court's refusal to admit it into evidence.

### (f) Cumulative Errors

Also without merit is Castaneda's assignment of error that the cumulative errors require reversal and a new trial. Because we find no merit to any of Castaneda's assignments of error, there are no cumulative errors, and we accordingly reject this argument.

## 2. Sentences

### (a) Arguments on Appeal

Castaneda argues that the district court erred in sentencing him to life imprisonment without the possibility of parole. The basis of Castaneda's argument at the time this case was originally argued was that the U.S. Supreme Court's decision in *Graham v. Florida*[33] categorically prohibited a sentence of life imprisonment without the possibility of parole for

---

[32] Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103 (Reissue 2008).

[33] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

juvenile offenders. In *Graham*, a juvenile who participated in an armed robbery was charged as an adult and sentenced to life imprisonment without the possibility of parole. The Supreme Court ruled that sentencing a juvenile to life imprisonment without parole for a nonhomicide crime was a violation of the Eighth Amendment prohibition against cruel and unusual punishment.

### (b) *Miller v. Alabama*

Following the submission of Castaneda's appeal to this court, the U.S. Supreme Court decided *Miller v. Alabama*.[34] *Miller* held it is unconstitutional to sentence a juvenile convicted of a homicide to a mandatory sentence of life imprisonment without the possibility of parole.

### (c) Further Argument

This court ordered further argument on the impact of *Miller* on Castaneda's sentence. During those arguments, the State argued that Castaneda's sentences are unaffected by *Miller* because they were not sentences without the possibility of parole. Rather, upon commutation to a term of years, parole would be available to Castaneda. The State further argued that if *Miller* did apply, Castaneda's current sentences of life imprisonment without the possibility of parole should be vacated and the cause remanded for resentencing in light of the sentencing factors discussed in *Miller*.

Conversely, Castaneda argued that the sentences imposed upon him were without the possibility of parole and that thus, *Miller* was applicable. Castaneda further argued that as a result of *Miller*, he could not be charged with a Class IA felony, because the only allowable sentence for such a felony would be life imprisonment. Castaneda instead asserted that he should be sentenced for second degree murder, a Class IB felony, because it is the "most serious degree of homicide for which he may be prosecuted" and thus provides the sentencing court

---

[34] *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

with the individualized sentencing options required by *Graham*
and *Miller*.[35]

### (d) Life Imprisonment Without
### Possibility of Parole

We first address the State's contention that *Miller* is inap-
plicable because Castaneda was not sentenced to life imprison-
ment without the possibility of parole.

At the time Castaneda was sentenced, Nebraska's statutes
provided that a juvenile convicted of first degree murder was
subject to mandatory life imprisonment. The statutes did not
expressly contain the qualifier "without parole."[36] However,
according to Neb. Rev. Stat. § 83-1,110 (Reissue 2008), a
committed offender becomes eligible for parole in Nebraska
after serving "one-half the minimum term of his or her sen-
tence." Because there is no way to compute "one-half" of a
life sentence, an offender sentenced to life imprisonment in
Nebraska for first degree murder is not eligible for parole.[37]
Instead, although such an offender has his record reviewed by
the Board of Parole every 10 years, he or she is not eligible
for parole until the "sentence is commuted."[38] If commutation
occurs, the offender's record is reviewed annually when he or
she is within 5 years of parole eligibility.[39]

In the State's supplemental brief, it argues that *Miller* barred
only those sentences denying any "'possibility of parole.'"[40] It
contends that Nebraska's scheme does not fall within this cat-
egory, because parole is *possible* in Nebraska if the sentence
is commuted to a term of years. Specifically, Neb. Const. art.
IV, § 13, authorizes the Board of Pardons, a group composed

---

[35] Supplemental brief for appellant at 20.

[36] See Neb. Rev. Stat. §§ 28-105 and 28-105.01 (Reissue 2008).

[37] *Poindexter v. Houston*, 275 Neb. 863, 750 N.W.2d 688 (2008). See *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

[38] Neb. Rev. Stat. § 83-192(1)(f)(v) (Reissue 2008).

[39] *Id*.

[40] Supplemental brief for appellee at 2, quoting *Graham, supra* note 33.

of the Governor, the Attorney General, and the Secretary of State,[41] to commute the sentence in "all cases of conviction," which includes sentences of life imprisonment.[42] Once the sentence is so commuted, the Board of Parole can review the sentence and release an inmate on parole.[43] According to the State, under Nebraska law, Castaneda therefore has some possibility of being paroled, and thus his sentences do not violate *Miller*.

But the mere existence of a remote possibility of parole does not keep Nebraska's sentencing scheme from falling within the dictates of *Miller*. *Miller* requires the sentencing scheme to provide "'some *meaningful* opportunity to obtain release based on demonstrated maturity and rehabilitation.'"[44] *Miller* cited the scheme in *Graham* as coming within its dictates. And the scheme at issue in *Graham*, like Nebraska's, did not expressly provide that the life sentence was "without parole." Nevertheless, the Court held in *Graham* that because Florida had abolished its parole system, the sentence effectively gave the defendant no possibility of release "unless he is granted executive clemency."[45]

Similarly, in *Bonilla v. State*,[46] the Iowa Supreme Court addressed whether *Graham* applied to a juvenile defendant convicted of a nonhomicide offense. Iowa's statute provided that the defendant's sentence was for life and that he "'shall not be released on parole unless the governor commutes the sentence to a term of years.'"[47] The Iowa court held that the fact that the defendant could "theoretically" receive a commutation was too much of a "'remote possibility'" to support

---

[41] Neb. Rev. Stat. § 83-1,126 (Reissue 2008).

[42] See, *Poindexter, supra* note 37; *Otey v. State*, 240 Neb. 813, 485 N.W.2d 153 (1992).

[43] § 83-192(1)(f)(v).

[44] *Miller, supra* note 34, 132 S. Ct. at 2469 (emphasis supplied), quoting *Graham, supra* note 33.

[45] *Graham, supra* note 33, 560 U.S. at 57.

[46] *Bonilla v. State*, 791 N.W.2d 697 (Iowa 2010).

[47] *Id.* at 700, quoting Iowa Code Ann. § 902.1 (West 2003).

an argument that the defendant's sentence was not with-
out parole.[48]

And in *State v. Dyer*,[49] a Louisiana court found that defend-
ants sentenced to life imprisonment were effectively sentenced
to life without parole when they could not be eligible for
parole "'until [the] life sentence has been commuted to a fixed
term of years.'" Noting that in Louisiana, the governor had
complete discretion regarding whether to commute a sentence,
*Dyer* held that the sentences were effectively without parole
and fell under the dictates of *Graham*.[50]

In addition, the U.S. Supreme Court itself has opined on the
substantial difference between executive commutation power
and parole.[51] According to the Court, parole and commutation
are different concepts as a matter of law, because parole is "a
regular part of the rehabilitative process,"[52] while commutation
is "an ad hoc exercise of executive clemency."[53]

Nebraska's parole system has absolutely no application to
Castaneda unless and until executive clemency in the form
of sentence commutation is granted. And in Nebraska, execu-
tive clemency is a "'*free gift from the supreme authority*,'"
"'*to be bestowed according to his own discretion*.'"[54] The
Board of Pardons thus has the unfettered discretion to grant or
deny a commutation for any reason or for no reason at all.[55]
The sentencing scheme here and the availability of executive
clemency under only a standard of unfettered discretion is
remarkably similar to Florida, Iowa, and Louisiana. We find
that Nebraska's sentence of life imprisonment is effectively
life imprisonment without parole under the rationale of *Miller*

---

[48] *Id*. at 700 n.2.

[49] *State v. Dyer*, 77 So. 3d 928, 929 (La. 2011).

[50] *Id*.

[51] *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983).

[52] *Id*., 463 U.S. at 300.

[53] *Id*., 463 U.S. at 301.

[54] *Otey, supra* note 42, 240 Neb. at 824, 485 N.W.2d at 163 (emphasis in
original), quoting *Pleuler v. State*, 11 Neb. 547, 10 N.W. 481 (1881).

[55] *Poindexter, supra* note 37.

and *Graham*, because it provides no meaningful opportunity to obtain release. As such, we reject the State's argument that *Miller* is inapplicable because Castaneda was not sentenced to life imprisonment without the possibility of parole.

### (e) *Griffith v. Kentucky*

Other than arguing that *Miller* was inapplicable for the reasons detailed and rejected above, the State concedes that *Miller*, as a new rule of law, would be applicable to any case on direct review. Castaneda concurs, and we agree. *In Griffith v. Kentucky*,[56] the U.S. Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Because this case is currently on direct appeal, *Miller* is applicable to Castaneda.

### (f) L.B. 44 and §§ 28-105.02 and 83-1,110.04

Since we heard further arguments, the Nebraska Legislature passed, and the Governor approved, 2013 Neb. Laws, L.B. 44, which amended state law to "change penalty provisions with respect to Class IA felonies committed by persons under eighteen years of age [and] to change parole procedures with respect to offenses committed by persons under eighteen years of age."

Neb. Rev. Stat. § 28-105.02 (Supp. 2013) provides:

> (1) Notwithstanding any other provision of law, the penalty for any person convicted of a Class IA felony for an offense committed when such person was under the age of eighteen years shall be a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment.
>
> (2) In determining the sentence of a convicted person under subsection (1) of this section, the court shall

---

[56] *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987).

consider mitigating factors which led to the commission of the offense. The convicted person may submit mitigating factors to the court, including, but not limited to:

(a) The convicted person's age at the time of the offense;

(b) The impetuosity of the convicted person;

(c) The convicted person's family and community environment;

(d) The convicted person's ability to appreciate the risks and consequences of the conduct;

(e) The convicted person's intellectual capacity; and

(f) The outcome of a comprehensive mental health evaluation of the convicted person conducted by an adolescent mental health professional licensed in this state. The evaluation shall include, but not be limited to, interviews with the convicted person's family in order to learn about the convicted person's prenatal history, developmental history, medical history, substance abuse treatment history, if any, social history, and psychological history.

And Neb. Rev. Stat. § 83-1,110.04 (Supp. 2013) further provides:

(1) Any offender who was under the age of eighteen years when he or she committed the offense for which he or she was convicted and incarcerated shall, if the offender is denied parole, be considered for release on parole by the Board of Parole every year after the denial.

(2) During each hearing before the Board of Parole for the offender, the board shall consider and review, at a minimum:

(a) The offender's educational and court documents;

(b) The offender's participation in available rehabilitative and educational programs while incarcerated;

(c) The offender's age at the time of the offense;

(d) The offender's level of maturity;

(e) The offender's ability to appreciate the risks and consequences of his or her conduct;

(f) The offender's intellectual capacity;

(g) The offender's level of participation in the offense;

(h) The offender's efforts toward rehabilitation; and

(i) Any other mitigating factor or circumstance submitted by the offender.

### (g) Disposition

At the time of Castaneda's sentencing for the first degree murder convictions, Class IA felonies, the district court was required by § 28-105(1) to impose sentences of life imprisonment. As we have explained, those sentences were tantamount to life imprisonment without the possibility of parole and, under *Miller*, were unconstitutional. As such, Castaneda's life imprisonment sentences must be vacated and Castaneda must be resentenced.

Subsequent to the enactment of L.B. 44, this court sought supplemental briefing on the issue of whether Castaneda should be resentenced under the provisions of L.B. 44. The State contends that L.B. 44 should be utilized; Castaneda argues that to do so would violate the Ex Post Facto Clauses of the U.S.[57] and Nebraska Constitutions.[58]

[10,11] This court ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution.[59] We have said that "'[a] law which purports to apply to events that occurred before the law's enactment, and which disadvantages a defendant by creating or enhancing penalties that did not exist when the offense was committed, is an ex post facto law and will not be endorsed by the courts.'"[60]

We have also held:

"Any statute which punishes as a crime an act previously committed which was innocent when done, which makes more burdensome the punishment for a crime after its commission, or which deprives one charged with a

---

[57] U.S. Const. art. I, § 10.

[58] Neb. Const. art. I, § 16.

[59] *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012).

[60] *Id.* at 83, 815 N.W.2d at 884.

crime of any defense available according to law at the time when the act was committed is prohibited as ex post facto. The Ex Post Facto Clause does not, however, extend to limit legislative control of remedies and modes of procedure which do not affect matters of substance. Thus, statutes governing substantive matters in effect at the time of a crime govern, and not later enacted statutes. In contrast, the procedural statutes in effect on the date of a hearing or proceeding govern, and not those in effect when the violation took place.

"A change in law will be deemed to affect matters of substance where it increases the punishment or changes the ingredients of the offense or the ultimate facts necessary to establish guilt. In other words, a rule is substantive if it alters the range of conduct or the class of persons that the law punishes. In contrast, rules that regulate only the manner of determining a defendant's culpability are procedural."[61]

We are therefore faced with the issue of whether the sentencing provisions set forth in L.B. 44 increase the punishment or change the ingredients of the offense or the ultimate facts necessary to establish guilt. Because L.B. 44 deals with sentencing, it does not affect the ingredients of the offense or the facts necessary to establish guilt. Thus, we must answer whether L.B. 44 increases the punishment; if it does, then the change is substantive and ex post facto principles bar application of L.B. 44 to Castaneda on resentencing.

Castaneda argues that we must determine whether L.B. 44 increases the punishment by comparing the possible range of sentences under L.B. 44 with the possible range of sentences for a Class IB felony. This argument is based upon Castaneda's contention that because *Miller* invalidated the Nebraska sentencing scheme for Class IA felonies committed by juveniles, a Class IB felony is the "most serious degree of homicide for which he may be prosecuted."[62]

---

[61] *Id.*

[62] Supplemental brief for appellant at 21.

We find this argument contradicts precedent from the U.S. Supreme Court. In *Dobbert v. Florida*,[63] the defendant was convicted of first degree murder. At the time the murder was committed, the applicable Florida statute provided that the murder was to be punished by death unless the jury recommended mercy. Before the case came to final judgment, the Florida Supreme Court, based on a U.S. Supreme Court decision, found the statute to be unconstitutional.[64] Florida then enacted a new statute specifying procedures to be utilized prior to the imposition of a death penalty. On appeal, the defendant argued that applying the new statute to him would violate ex post facto principles by increasing the punishment he was subject to. His argument was that because the prior statute was found to be unconstitutional, there was no valid death penalty in Florida as of the date of his actions, and that he thus could not be subjected to that penalty under the new statute. The Court rejected this argument, concluding:

> [T]his sophistic argument mocks the substance of the *Ex Post Facto* Clause. Whether or not the old statute would, in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.
>
>    . . . Here the existence of the statute served as an "operative fact" to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution.[65]

---

[63] *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977).

[64] See *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

[65] *Dobbert, supra* note 63, 432 U.S. at 297.

*Dobbert* makes it clear that the effect of *Miller* on Nebraska law is not a factor in the ex post facto analysis of whether a later-enacted statute increases punishment for a crime. Rather, the proper comparison is the range of penalties that Nebraska law provided for a Class IA felony committed by a juvenile at the time Castaneda committed his crimes, within the range of penalties Nebraska law provides for a Class IA felony committed by a juvenile at the time Castaneda is resentenced. We observe that this is consistent with the underlying purpose of the Ex Post Facto Clause: to "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed."[66]

At the time Castaneda was sentenced, the only possible sentence for a first degree murder committed by a juvenile was life imprisonment. Under L.B. 44, the sentence is anywhere from 40 years to life imprisonment.[67] The possible range of sentences provided for in L.B. 44 is not greater than the possible range of sentences which Castaneda was originally subjected to.[68] As such, the change effected by L.B. 44 does not violate ex post facto principles.

[12] Nor is it inconsistent under Nebraska law for this mitigation in sentencing to apply upon resentencing. "[W]here a criminal statute is amended by mitigating the punishment, after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature has specifically provided otherwise."[69] And in this case, the Legislature has not provided otherwise. We therefore vacate Castaneda's life sentences and remand the cause for resentencing under the procedures set forth under L.B. 44.

---

[66] *Weaver v. Graham*, 450 U.S. 24, 28-29, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981).

[67] See § 28-105.02(1).

[68] See §§ 28-105 and 28-105.01.

[69] *State v. Randolph*, 186 Neb. 297, 301-02, 183 N.W.2d 225, 228 (1971). See, *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999); *State v. Groff*, 247 Neb. 586, 529 N.W.2d 50 (1995).

We decline to address Castaneda's argument under *Graham* as presented by his brief on appeal, because the possibility exists that upon remand, Castaneda might not be resentenced to life imprisonment.

Finally, the State argues that the district court committed plain error when it failed to order Castaneda's three sentences for use of a deadly weapon to run consecutively "to *all* other sentences imposed."[70] We agree and vacate all of Castaneda's other sentences and remand the cause for resentencing.[71]

## VI. CONCLUSION

Castaneda's assignments regarding trial error are without merit. But the life imprisonment sentences imposed upon Castaneda were effectively life imprisonment without the possibility of parole and unconstitutional under *Miller*.[72] We accordingly vacate those unconstitutional sentences and remand the cause for resentencing. We also vacate all of Castaneda's other sentences, because the district court committed plain error in ordering some of those sentences to run concurrently rather than consecutively.

Convictions affirmed, all sentences vacated,
and cause remanded for resentencing.

_____

[70] Brief for appellee at 75 (emphasis in original).

[71] See, Neb. Rev. Stat. § 28-1205(3) (Cum. Supp. 2012); *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012); *State v. Russell*, 248 Neb. 723, 539 N.W.2d 8 (1995).

[72] *Miller, supra* note 34.

_____

State of Nebraska, appellee, v.
Douglas M. Mantich, appellant.
___ N.W.2d ___

Filed February 7, 2014.    No. S-11-301.

1. **Constitutional Law: Sentences.** Whether a sentence violates the Eighth Amendment's cruel and unusual punishment clause presents a question of law.

2. **Judgments: Appeal and Error.** When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling.